**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| POURYA MALEK,<br><br>    Plaintiff,<br><br>    v.<br><br>JEFFERY GREEN, et al.,<br><br>    Defendants. | Case No. 17-cv-00263-BLF<br><br>**ORDER GRANTING IN PART WITHOUT LEAVE TO AMEND AND DENYING IN PART THE OFFICER DEFENDANTS' OMNIBUS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>[Re: ECF 55] |

This case arises out of an incident that occurred between Plaintiff Pourya Malek ("Malek") and three police officers from the California Department of Justice ("DOJ") at Malek's home on February 4, 2016. Malek brought suit against Special Agents Jeffery Green, Lance Sandri, and Elisardo Favela (the "Officers") for several violations of his civil rights pursuant to 42 U.S.C. § 1983 and related state law causes of action. *See* ECF 1 ("Compl."). Defendants moved to dismiss the original complaint, which the Court granted in part with leave to amend and denied in part. *See* ECF 49 ("Prior Order"). Malek filed a First Amended Complaint on October 18, 2017. *See* ECF 52 ("FAC"). The Officers now move to dismiss the FAC, arguing that they are entitled to qualified immunity on Malek's amended § 1983 causes of action and that his state law claims also fail. *See* ECF 55 ("Mot.").

The Court held a hearing on the Officers' motion to dismiss the FAC on May 3, 2018. For the reasons that follow as well as those stated on the record at the hearing, the Officers' motion to dismiss is GRANTED IN PART WITHOUT LEAVE TO AMEND and DENIED IN PART.

# I.     BACKGROUND[1]

The facts of this case are familiar to the parties and the Court and are set forth at length in this Court's Prior Order.  The Court summarizes the relevant facts here, focusing on Malek's amended allegations in the FAC.

On October 22, 2012, Malek pleaded no contest in the California Superior Court for Santa Clara County to a misdemeanor charge of having violated California Penal Code § 417.4 (brandishing of a replica firearm).  FAC ¶ 40.  A no-contest plea to a § 417.4 charge does not prevent a person from possessing or owning firearms, because the operative statute—California Penal Code § 29805—does not list § 417.4 among the offenses for which a person may be convicted under § 29805.  *Id.* ¶ 41.  On or about February 4, 2016, the Officer Defendants reviewed a California Department of Justice-Bureau of Firearms Armed Prohibited Person System ("APPS"), Prohibited Person Report ("PPR"), which had been generated on November 12, 2015.  *Id.* ¶ 42.  The PPR stated that Malek had been convicted of Penal Code § 417.4 in 2012 and that he possessed seven registered firearms.  *Id.* ¶¶ 43, 47.  Malek alleges that he should not have been listed as a "prohibited person" because no criminal statute, including Penal Code § 29805, prohibits a person with a § 417.4 conviction from possessing or owning firearms.  *Id.* ¶ 43.

Based on two state audit reports finding that the DOJ failed to maintain the APPS database in connection with mental health-based firearm prohibitions, Malek alleges on information and belief that the database's criminal conviction-based firearms prohibitions were similarly inaccurate.  *Id.* ¶¶ 17-30.  Malek further alleges that the Officer Defendants recklessly disregarded their training and knowledge about the inaccuracies in the APPS database by not reviewing the Penal Code, and § 29805 in particular, to ensure that Malek was properly included on the PPR at issue.  *Id.* ¶¶ 38, 44-45.

Rather than ensuring that Malek's § 417.4 conviction made him eligible for inclusion on the PPR, Malek alleges that the Officers went to his home with the intention of getting him to

---

[1] The well-pled factual allegations in the FAC are construed in the light most favorable to Malek for the purposes of this motion to dismiss.  *Reese v. BP Exploration (Alaska) Inc.,* 643 F.3d 681, 690 (9th Cir. 2011).

voluntarily surrender his firearms and to cite and release him, but not to arrest him and take him to jail. *Id*. ¶ 48. Around 9:00 P.M., the Officers arrived at Malek's home and knocked on his door. *Id*. ¶ 50. Malek alleges that he partially opened the front door, while standing well within his home, some feet away from the front door's threshold. *Id*. ¶ 51. Officer Green told Malek that he was prohibited from owning firearms due to his 2012 conviction. *Id*. Malek responded that the Officers were mistaken, because his criminal defense attorney had told him that he could lawfully possess firearms. *Id*. ¶ 52. Officer Green told Malek that he needed to give up his firearms, and Malek asked if the Officers had a warrant. *Id*. ¶¶ 53-54. Malek alleges that his repeated assertions of his rights made the Officers "visibly irritated." *Id.* ¶ 54.

The Officer Defendants then told Malek that he had "options," and he could either give up his firearms voluntarily, in which case he would not be taken to jail, or Malek could wait for the Officers to obtain a search warrant for the firearms, in which case Malek would be arrested and taken to jail. *Id.* ¶ 54. In response, Malek closed the door slightly, stepped back further into his house, stated that he wanted to speak to his attorney, and again demanded to see a search warrant. *Id.* ¶ 55.

Although the Officers had not planned to enter Malek's home or arrest him when they came to the house to confiscate the firearms, Malek alleges that the Officers decided to punish him for his "defiance" by not voluntarily surrendering his guns and asking to see a warrant. *Id.* ¶ 56. Specifically, Malek alleges that Officer Sandri barged into the house, crossing the threshold and forcing Malek back into his home. *Id.* ¶ 57. Officers Green and Favela followed behind Officer Sandri into the house, and all of the Officers stood in Malek's living room when Officer Sandri told Malek he was under arrest. *Id.* ¶¶ 57-58. Malek was handcuffed behind his back with only one set of handcuffs, even though Malek alleges that the Officers had been trained to handcuff a person of Malek's stature with two sets of handcuffs to avoid unnecessary pain. *Id.* ¶ 58.

Before obtaining a search warrant, Malek alleges that Officers Green and Favela searched the house for the firearms that would eventually be the subject of the search warrant. *Id.* ¶ 60. The Officers located the gun safe and the shotgun in the bedroom that Malek had mentioned to them. *Id.* The pre-warrant search also included going into Malek's garage to take photographs of

Malek's vehicles. *Id*. ¶ 61.  When Malek asked why the Officers were searching his home without a warrant, the Officers replied that they did not need one. *Id*.  The FAC adds allegations that Malek asked his wife, Fatemeh, to get the court documents from his § 417.4 case. *Id*. ¶ 62.  When Fatemeh, who was not handcuffed, retrieved the court documents and Malek showed them to Officer Sandri, the Officers did not change their conclusion that Malek was prohibited from owning firearms because of the § 417.4 offense. *Id*.

Malek alleges that the Officers gave him another opportunity to give up his firearms and avoid being taken to jail, but Malek insisted that they get a search warrant for the guns. *Id*. ¶¶ 65-66.  Officer Sandri, who Malek alleges was the supervisor and leader of the operation, directed Officer Green to obtain a search warrant for the firearms. *Id*. ¶ 67.  After Officer Green left the house to obtain the warrant, Officer Sandri continued to try to convince Malek to give up the firearms voluntarily, advising him that obtaining a warrant would take several hours. *Id*. ¶ 68.  Malek refused again. *Id*.  A few hours later, Malek told Officers Sandri and Favela that he was experiencing significant pain from the handcuffs, including that they were aggravating his pre-existing back injury, and that the handcuffs were too tight on his wrists. *Id*. ¶ 71.  Malek alleges that the Officers ignored his repeated complaints and refused his request to handcuff him in front, although Officer Sandri added a second pair of handcuffs after several hours. *Id*. ¶¶ 71-74.

Meanwhile, Officer Green had authored a statement of probable cause in support of the search warrant that incorrectly stated: "[d]ue to the misdemeanor conviction, of 417.4 PC, MALEK is prohibited from owning or possessing firearms for a ten year period after the conviction date (through 10/23/2022) per section 29805 PC (Possession of Firearm by Misdemeanant), a felony violation." *Id*.  ¶ 77.  Malek alleges that Officer Green violated his training and DOJ policy by not requesting that any attorney review his statement of probable cause of the search warrant before presenting them to the magistrate judge, who signed the search warrant at about 3:54 a.m. on February 5, 2016. *Id*. ¶¶ 78-79.  Around 4:15 A.M. Officer Green called Officer Sandri and told him that he had obtained the search warrant. *Id*. ¶ 80.  When Malek asked to see the search warrant, Officer Sandri was "frustrated" and told Malek that it was good enough that Officer Green had obtained it. *Id*.

4

As previously alleged, Officer Sandri instructed Malek to open the gun safe or the Officers would have a locksmith come drill it open. *Id.* Because Malek remained handcuffed, he instructed his wife to open the gun safe. *Id.* ¶ 81. Officers Favela and Sandri seized the guns and ammunition in the safe as well as several knives on display near the safe. *Id.* At some point after opening the gun safe, Officer Green returned to the house and showed the search warrant to Malek. *Id.* One or more of the Officers also searched the house after opening the gun safe and took photographs. *Id.*

At 6:00 A.M. on February 5, 2016, at which point Malek had been in handcuffs for approximately nine hours, Malek heard Officer Green tell Officer Sandri that they should put down 6:00 A.M. as the time for Malek's arrest. *Id.* ¶ 83. The Officers then transported Malek to Santa Clara County Jail where he was booked on charges for violations of two felonies: California Penal Code § 29805 and § 30305 (prohibiting possession of ammunition, based on a violation of § 29805). *Id.* ¶ 86. Malek remained in custody until 1:00 P.M. on February 5, 2016. *Id.* A few hours later, at 6:00 P.M. that evening, Officer Sandri left a voicemail for Malek stating that their "paperwork" had been incorrect and that Malek was not prohibited from owning or possessing firearms. *Id.* ¶ 87. The Officers returned Malek's firearms and ammunition at 9:00 p.m. on February 5, 2016. *Id.*

In response to the Court's Prior Order, Malek filed the FAC. He reasserts the following federal claims pursuant to 42 U.S.C. § 1983 against the Officers for (1) unlawful entry into the home ("Count 1"); (2) unlawful arrest ("Count 2"); (3) unlawful searches ("Count 3"); (4) excessive force ("Count 4"); (5) violation of the Second Amendment ("Count 5");[2] and (6) retaliation ("Count 6"). *See* FAC ¶¶ 96-116. Malek also realleges state law causes of action against the Officer Defendants for (7) violation of the Bane Act, California Civil Code § 52.1 ("Count 7"); (8) negligence and personal injuries ("Count 8"); (9) assault and battery ("Count 9"); and (10) false arrest or imprisonment ("Count 10"). FAC ¶¶ 117-137.

[2] At the May 3, 2018 hearing on the Officers' motion to dismiss the FAC, Malek voluntarily dismissed Count 5 based on a violation of the Second Amendment. Accordingly, the Officers' motion to dismiss Count 5 of the FAC is GRANTED WITHOUT LEAVE TO AMEND.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar,* 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.,* 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Pursuant to Federal Rule of Civil Procedure 15(a), a court should grant leave to amend a complaint "when justice so requires," because "the purpose of Rule 15 ... [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).  The Court may deny leave to amend, however, for a number of reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (2003) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

### B.    Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

conduct.'" *Wood v. Moss,* 134 S.Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011)). "[T]he Supreme Court has 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Dunn v. Castro,* 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)). Under the applicable pleading standard, the plaintiff must allege facts sufficient to make out a plausible claim that it would have been clear to the defendant officer that his conduct was unlawful in the situation he confronted. *Id.* at 2067. "Because qualified immunity is an affirmative defense from suit, not merely from liability, '[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Doe By and Through Doe v. Petaluma City School Dist.,* 54 F.3d1447, 1449–50 (9th Cir. 1995) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

In *Saucier v. Katz,* 533 U.S. 194 (2001), the Supreme Court set forth a two-part approach for analyzing qualified immunity. The analysis contains both a constitutional inquiry and an immunity inquiry. *Johnson v. County of Los Angeles,* 340 F.3d 787, 791 (9th Cir. 2003). The constitutional inquiry requires the court to determine this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If the Court determines that a constitutional violation could be made out based on the parties' submissions, the second step is to determine whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. The Supreme Court has clarified that the *sequence* of analysis set forth in *Saucier* is not mandatory and that a court may exercise its sound discretion in determining which of the two prongs of the qualified immunity analysis to address first. *Pearson v. Callahan,* 555 U.S. 223, 241-42 (2009). Thus, in some cases, it may be unnecessary to reach the ultimate constitutional question when officers would be entitled to qualified immunity in any event, a result consistent with longstanding principles of judicial restraint.

The Supreme Court recently reiterated the longstanding principle that a "clearly established" constitutional right "should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *al-Kidd*, 563 U.S. at 742). Rather, it must be "particularized" to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Ricard*, 134 S.Ct. 2012, 2023 (2014). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). "A right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013). "The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional." *Id.*

## III.    DISCUSSION

### A.    Section 1983 Claims

To state a claim under § 1983, a plaintiff must allege that "(1) the defendants acting under color of state law (2) deprived plaintiff [ ] of rights secured by the Constitution or federal statutes." *Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir. 1986). As explained above, even if a plaintiff plausibly alleges the deprivation of a constitutional right under color of state law, government officials are protected from liability for civil damages by the doctrine of qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Wood*, 134 S.Ct. at 2066–67 (quoting *al-Kidd,* 131 S.Ct. at 2080).

The Officers move to dismiss each of Malek's § 1983 claims alleged in the FAC based on qualified immunity. *See generally* Mot. For the reasons that follow, as well as those stated on the

record at the May 3, 2018 hearing, the Officers' motion to dismiss Malek's § 1983 claims is GRANTED IN PART WITHOUT LEAVE TO AMEND and DENIED IN PART.

### i. Arrest without Probable Cause

Although it is the second count in the FAC, the Court begins by addressing Malek's § 1983 claim for an unlawful arrest.[3]  An arrest made without probable cause is an unreasonable seizure under the Fourth Amendment.  *Dubner v. City & Cnty. of San Francisco,* 266 F.3d 959, 964 (9th Cir. 2001).  Probable cause to arrest exists when, "under the totality of the circumstances known to the arresting officers ... a prudent person would believe the suspect had committed a crime." *Dubner,* 266 F.3d at 966.

The Court previously dismissed the unlawful arrest claim with leave to amend, finding that Malek failed to allege an unreasonable mistake of law by the Officers and further concluding that any alleged violation was not clearly established.  *See* Prior Order at 10-18.  The Officers argue that, even accepting Malek's amended allegations as true, the Officers remain shielded by qualified immunity under either prong of the test.  Mot. at 6-12.  The Court agrees, and finds that the Officers are entitled to qualified immunity under both prongs with respect to Malek's § 1983 claim for an unlawful arrest.

Malek's unlawful arrest claim still boils down to whether the Officers were required to cross-check § 29805 once they reviewed the PPR in order to ensure that Malek's § 417.4 misdemeanor was a qualifying offense.  Under the first prong of qualified immunity, Malek argues that he has alleged a constitutional violation because the Officers' reliance on the PPR was objectively unreasonable.  Opp'n at 10-11, ECF 60 ("To the extent Defendants made a mistake of law, it was not a reasonable mistake, and probable cause therefore was lacking.")  Despite additional factual pleading, the Court finds that Malek has not plausibly alleged that it was objectively unreasonable for the Officers to rely on the PPR to provide an accurate representation of the law without checking the statute itself.  Regardless, any alleged constitutional violation was not clearly established.

---

[3] As discussed below, the unlawful arrest claim is entirely distinct from Malek's claim for unlawful *entry* into the home (Count 1).

The Court has reviewed Malek's allegations that the California State Auditor investigated the APPS database in 2013 and 2015 regarding firearms prohibitions for mentally ill individuals. *See* FAC ¶¶ 18-31.  The Court need not change its previous determination that Malek fails to state a claim for an unlawful arrest because Malek's new allegations regarding the California State Auditor's reports on the APPS database are implausible.  The allegations about the existence of errors concerning mental illness prohibitions do not inform the constitutional reasonableness inquiry in Malek's case.[4]  In particular, the audit reports, which the Officers provided to the Court based on the incorporation by reference doctrine, primarily dealt with the issue of false negatives due to the *underreporting* from Superior Courts of individuals with mental health issues who possessed guns.  *See* Declaration of Robert S. J. Rogoyski, Exh. A, ECF 55-1.  This case undeniably deals with a false positive: Malek's inclusion on the PPR when, in fact, he never committed a qualifying offense.  Accordingly, the Court gives no weight to Malek's allegations based on the State Auditor's reports because it is not plausible that the results would put any reasonable officer on notice of completely unrelated database flaws.

In addition, Malek's allegations "on information and belief" that the DOJ and the Bureau of Firearms train their field officers to cross-check the statutes for every PPR lack the requisite factual support under *Twombly* and *Iqbal*, and require the Court to make an unreasonable inferential leap.  Thus, even assuming that the Officers failed to check whether § 417.4 was a qualifying offense under § 29805, Malek has not plausibly alleged that it was objectively unreasonable for the Officers to rely on the PPR to conduct further fieldwork to confirm other information to support probable cause to arrest Malek.  For the foregoing reasons, as well as those discussed at length in its Prior Order regarding the unlawful arrest claim, the Court finds that the Officers' alleged conduct meets the Fourth Amendment's reasonableness standard and Malek has failed to state a plausible claim that he was arrested without probable cause.

---

[4] Malek does not allege that he suffers from any mental illness.  Rather, his theory, alleged on information and belief, is that although the prohibitions related to criminal convictions were not the subject of the State Auditor's review of the APPS database, those prohibitions suffered from the same inaccuracies as the prohibitions related to mental health.  *See* FAC ¶ 26.

Regardless of the constitutional violation, the unlawful arrest claim fails under the second prong of qualified immunity as well. The Ninth Circuit has recently emphasized that it is Malek's burden under the second prong of qualified immunity to identify a case indicating that the right allegedly violated was clearly established. "Except in the rare case of an 'obvious' instance of constitutional misconduct (which is not presented here), Plaintiffs must *identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment." *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original) (quoting *White v. Pauly*, 137 S.Ct. at 552). The preexisting law identified must also be "controlling—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a consensus of courts outside the relevant jurisdiction." *Id.* (internal citation and quotation omitted).

The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *City & Cnty. Of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1775–76 (2015) (citations omitted). The Ninth Circuit has responded: "We hear the Supreme Court loud and clear." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017). Accordingly, in order for the Court to impose liability on the Officers, there must be precedent as of February 4, 2016—the night of Malek's arrest—that put the Officers on notice that arresting Malek in these factual circumstances would run afoul of the Fourth Amendment. *Id.* Malek has failed for the second time to point the Court to such precedent, nor has the Court found any such case.

In light of the particular circumstances alleged in the FAC, the question before the Court is whether it was clearly established on February 4, 2016 that officers who knew the APPS database contained errors related to mental health issues, and who ignored training and policy directing them to confirm whether § 417.4 is a qualifying offense under § 29805, could not rely on a DOJ-issued PPR identifying an individual illegally possessing firearms to support probable cause to arrest once the suspect identified himself and confirmed that he owned the guns.

None of the cases cited by Malek present similar factual circumstances and thus they do not put the Officers on notice that Malek's arrest was unlawful. Malek mentions the following cases in his opposition: *Willis v. Mullins*, 517 F.Supp.2d 1206, 1226 (E.D. Cal. 2007), *aff'd sub*

*nom. Willis v. Mora*, 314 F. App'x 68 (9th Cir. 2009); *United States v. Miguel*, 368 F.3d 1150, 1154 (9th Cir. 2004) *overruled on other grounds by United States v. Gasca-Ruiz*, 852 F.3d 1167 (9th Cir. 2017); *Littlefield v. Viveros*, No. 1:06-cv-1530 OWW-DLB, 2007 WL 4284864 (E.D. Cal. Dec. 4, 2007); *Torres v. County of Madera*, NO. 1:10-cv-00670 LJO SKO, 2011 WL 6141080 (E.D. Cal. Dec. 9, 2011); *Torres v. City of Madera*, 648 F.3d 1119, 1228-29 (9th Cir. 2011); and *Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004). *See* Opp'n at 12-13, ECF 60.

With respect to *Willis*, *Littlefield,* and *Torres v. County of Madera*, these district court decisions are not controlling Ninth Circuit or Supreme Court authority and the Court need not consider them in its analysis under the second prong of qualified immunity. *Sharp*, 871 F.3d at 911. Moreover, Malek does not demonstrate that these cases form a "consensus" with other court decisions amounting to clearly established preexisting law. Each of these cases is also factually dissimilar from Malek's arrest in this case.

The Ninth Circuit did affirm the district court's denial of qualified immunity at the summary judgment stage in *Willis*, but in that case, the plaintiff's name erroneously appeared on a parole roster and the defendants did nothing further to confirm the mistaken *factual* information. 314 F. App'x at 69. "Based solely on their belief that Plaintiff was a parolee subject to a search condition," the defendants entered Plaintiff's motel room without his consent. 517 F. Supp. 2d at 1221. Here, Malek alleges that the Officers confirmed all of the relevant factual information in the PPR—Malek's conviction, his address, identity, and that he owned the registered firearms at issue—but instead Malek challenges the reasonableness of the Officers' failure to know that § 417.4 is not a qualifying offense for § 29805. *Willis* does not address the reasonableness of a mistake of law, as it was decided before the Supreme Court made clear in *Heien v. North Carolina* that the Court's Fourth Amendment inquiry must consider the objective reasonableness of a mistake of law. 135 S.Ct. 530, 539 (2014).[5]

---

[5] In *Heien*, an officer stopped a vehicle because one of its two brake lights was out, but it was later determined that the law only required a single working brake light. 135 S.Ct. at 534. In other words, the defendant was pulled over despite the fact that his conduct did not actually violate any law. The defendant was then charged with drug possession based on the post-arrest search of his

For similar reasons, *United States v. Miguel* also fails to clearly establish the constitutional violation in this case. 368 F.3d 1150, 1154 (9th Cir. 2004). *Miguel* was another pre-*Heien* case where two sheriff's deputies pulled over the defendant's car based on the mistaken belief that the car's registration had expired. *Id*. at 1151. Without conducting a further investigation, the deputies searched the car and found five illegal immigrants hiding in the back seat and trunk of the car. *Id*. at 1151-52. The Ninth Circuit held that "if the deputies were mistaken in believing that the vehicle registration had expired, their mistake was one of fact due to their reasonable reliance on the expiration date in a computer database." *Id*. at 1152. Malek does not explain how a vehicle registration database is anything like the APPS database or the PPR in this case, or how *Miguel* is relevant given that those deputies "did not misapprehend the law." *Id*. at 1154. Put simply, *Miguel* does not put a reasonable officer in Defendants' position on notice that failing to confirm whether § 417.4 is included in § 29805, even when Malek insisted that his possession of the firearms was permitted, violated clearly established law.

In *Littlefield*, officers conducted a traffic stop of plaintiff for failing to stop at a stop sign. 2007 WL 4284864, at *1 (E.D. Cal. Dec. 5, 2007), *report and recommendation adopted*, No. 106-CV-1530-OWW-DLB, 2008 WL 598246 (E.D. Cal. Mar. 4, 2008). After the officers retrieved the plaintiff's driver's license, they called dispatch who erroneously told one of the officers that the plaintiff was on active felony probation and that he was open to search and seizure. *Id*. The officers searched the plaintiff's vehicle based on the information from dispatch, although an investigation later revealed that the plaintiff was not on probation at the time of the search. *Id*.

In addition to being a district court decision that cannot clearly establish the law in this case, *Littlefield* actually recommended *granting* the officers' motion to dismiss because the allegations in the plaintiff's complaint—although they likely stated a constitutional violation—supported a finding that the officers were entitled to qualified immunity. 2007 WL 4284864, at *4 (E.D. Cal. Dec. 5, 2007). The *Littlefield* court held that the officers "were reasonable in relying on

car. The defendant moved to suppress evidence seized from his car on the grounds that the stop and search were invalid under the Fourth Amendment. The Supreme Court held that the officer's mistake about the brake-light law was reasonable, and such a reasonable mistake of law rendered the seizure lawful under the Fourth Amendment. *Id*. at 534.

the erroneous dispatch report, despite Plaintiff's statements that he was not on parole or probation. If the Court found otherwise, it would essentially result in a requirement that law enforcement officials, when faced with conflicting information from a suspect, take additional affirmative steps to verify information. Given the situations in which officers often find themselves, they do not have the luxury of time or resources to confirm the information they receive during traffic stops." *Id.* Thus, although the court applied the standard discussed above from *Willis*, *Littlefield* is not a case where an officer acting under similar circumstances as the Officer Defendants was found to have violated the Fourth Amendment. *Sharp*, 871 F.3d at 911. If anything, its conclusion supports that the Officers' reliance on the APPS and PPR to arrest Malek was reasonable.

*Torres v. County of Madera* also fails to get Malek over the qualified immunity hurdle. In *Torres*, parole officials reviewed the plaintiff's case file and two state parolee databases and identified the plaintiff as an active parolee subject to "search and supervision." 2011 WL 6141080 at *1 (E.D. Cal. Dec. 9, 2011). Based on that information, the officials conducted a parole search of the plaintiff's residence. *Id.* It turned out that the plaintiff was not on active parole at the time of the search. *Id.* at *4. Again, Malek does not even attempt to explain how cases involving the specific context of an erroneous parole search would notify *these* Officers in *this* case that reliance on the APPS and PPR in a firearms investigation was unreasonable.[6] As the Officers point out, parole rosters and PPRs are not comparable as they are compiled by different entities, use different data sources and serve different purposes. Reply at 3, ECF 61.

Malek also cites, in passing, to the Ninth Circuit's decision in *Torres v. City of Madera*, 648 F.3d 1119, 1228-29 (9th Cir. 2011). Opp'n at 12. Malek cites to *City of Madera* for general propositions of law but he does not argue—nor could he—that its factual circumstances clearly establish the law in this case. *City of Madera* dealt with the tragic shooting of an individual who was handcuffed in the back seat of a patrol car based on the officer's mistaken belief that she was

---

[6] The *Torres* court acknowledged that parole cases are unique in that where a parolee has signed a condition of parole allowing searches by law enforcement without a warrant, an officer may conduct a warrantless search of the parolee and his residence without offending the Fourth Amendment. No. 1:10-CV-00670 LJO, 2011 WL 6141080, at *4 (E.D. Cal. Dec. 9, 2011).

shooting with her taser when in fact she shot and killed the individual with a semiautomatic pistol. 648 F.3d at 1120. Given the material factual differences to the circumstances confronted by the Officers in this case, *City of Madera* does not clearly establish that Malek's arrest violated the Fourth Amendment.

Finally, the amended allegations in the FAC do not convince the Court to change its prior conclusion that *Beier v. City of Lewiston*, 354 F.3d 1058 (9th Cir. 2004) does not demonstrate that the Officers' conduct violated "clearly established" federal law. *See* Prior Order at 15-16. Malek repeats his previously rejected argument that *Beier* satisfies the second prong of qualified immunity because the Ninth Circuit denied qualified immunity where officers simply relied on incorrect information conveyed by their dispatcher and did not read the protective order. Opp'n at 13. Malek argues that *Beier* cited to "precisely analogous" cases clearly establishing that officers have a duty to read a search warrant before executing it. *Id.*

In *Beier*, the officers relied on the statement of an ordinary citizen, Susan, to arrest the plaintiff after Susan called the police to report that the plaintiff was violating a restraining order she had in place against him. 354 F.3d at 1063. The officers "knew nothing about the terms of the order other than what, if anything, Susan told them." *Id.* It turned out that none of the plaintiff's actions were a violation of the protective order. *Id.* at 1067. The Ninth Circuit concluded that the officers lacked probable cause to arrest the plaintiff and that "[a]ny reasonably competent officer would have ascertained the terms of the protection order before arresting Beier for failing to comply with it." *Id.* at 1072. As the Court explained in its Prior Order, in stark contrast to *Beier*, Malek's case does not involve an unsubstantiated legal conclusion by an ordinary citizen that Malek had violated a law. Here, the Complaint alleges that the Officers reviewed an official Prohibited Persons Report, generated by personnel at the California Department of Justice, that contained a mistake but nevertheless indicated to the Officers that Malek possessed seven firearms in violation of § 29805. *See* Prior Order at 15.

The Ninth Circuit in *Beier* confirmed that "when there is a conflict between legal information obtainable from official channels and legal information obtained from lay citizens, police officers may reasonably rely upon officially-obtained information." 354 F.3d at 1070.

Malek does not address the Court's previous concerns with using *Beier* to clearly establish the alleged unlawful arrest in this case. *Beier* is not sufficiently analogous to notify the Officers that it was objectively unreasonable to rely on the information contained in the DOJ-issued PPR.

Malek also argues that the Officers' training and standards placed them on notice of clearly established law. Opp'n at 12-13 (citing *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003); *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1131 (9th Cir. 2002); *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1162, n. 7, 1168, n.9 (9th Cir. 2011)). Other than mere citations to these factually dissimilar cases, Malek does not explain how these cases clearly establish the unlawfulness of his arrest. Like the cases above, the Court finds that *Drummond, Headwaters,* and *Young* do not clearly establish that the Officers' conduct was unconstitutional.

The Court also rejects Malek's argument that the Penal Code gave the Officers fair warning of the constitutional violation. Opp'n at 13 ("Statutory law, including the California Penal Code, can place officers on notice of clearly established law.") (citing *Hardwick v. Cty. of Orange*, 844 F.3d 1112, 1120 (9th Cir. 2017)). In *Hardwick*, a child brought a § 1983 action against county social workers, alleging that the social workers maliciously used perjured testimony and fabricated evidence to secure the child's removal from her mother. 844 F.3d at 1114. Not only are the facts of *Hardwick* completely irrelevant to the case at hand, but the Ninth Circuit identified a pertinent state statute that warned the social worker defendants "in unmistakable language of the personal consequences of lies, perjury, and deception: the loss of immunity for such conduct." *Id*. at 1120. Malek's argument that the entire Penal Code gave the Officers fair warning of the unlawfulness of their conduct stretches *Hardwick* too far, as it applies only to an "obvious" case of unconstitutional conduct. *Id*. ("We believe this is the kind of case the Supreme Court had in mind in *Hope* when it talked about conduct so clearly and obviously wrong that the conduct itself unmistakably 'should have provided [defendants] with some notice' that their alleged conduct violated their targets' constitutional rights.")

For the foregoing reasons, as well as those stated in the Court's Prior Order, the Officers are shielded by qualified immunity on Malek's claim for an unlawful arrest (Count 2). Malek fails to allege a constitutional violation and further fails to "point to prior case law that articulates a

16

constitutional rule specific enough to alert *these* [Officers] *in this case* that *their particular conduct* was unlawful." 871 F.3d at 911 (emphasis in original). Without precedent that would have alerted the Officers that their conduct was unlawful, or a showing that the alleged constitutional violation was so "obvious" that a specific case on point is not required, qualified immunity applies. The Officers' motion to dismiss Malek's second cause of action in the FAC for unlawful arrest is GRANTED WITHOUT LEAVE TO AMEND.

### ii. Unlawful Entry to Arrest

The FAC now clarifies that Malek brings a § 1983 claim against the Officers for unlawful entry into the home in violation of the Fourth Amendment as a separate cause of action from his unlawful arrest claim. *See* FAC ¶¶ 96-101. Even if the Officers had probable cause to arrest Malek, the arrest in this case may have violated the Fourth Amendment if the Officers' entry into Malek's home to affect the arrest in his living room was unlawful.

At the very core of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). In fact, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972). Based on the right to be secure inside one's home, the Supreme Court held in *Payton v. New York* that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."445 U.S. 573, 576 (1980). Therefore, "searches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Martinez,* 406 F.3d 1160, 1163 (9th Cir. 2005) (internal quotation marks omitted) (quoting *Payton,* 445 U.S. at 586). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). But exceptions to the warrant requirement do exist, and officers can rebut the presumption of unreasonableness by showing some exception to the warrant requirement excused them from getting a warrant. *See Fisher v. City of San Jose*, 557 F.3d 1069, 1074-75 (9th Cir. 2009).

Here, the Officers argue that two exceptions excused their undisputedly warrantless entry

17

into Malek's home: (1) the "doorway" exception; and (2) exigent circumstances. Mot. at 12-14. The Court disagrees, and finds that the FAC adequately pleads that the Officers violated the Fourth Amendment by crossing the threshold of the doorway into Malek's home to arrest him without a warrant, without consent, and absent exigent circumstances, while he stood in his living room. Moreover, Malek's right to be free from such an unlawful entry was clearly established as of February 4, 2016. The qualified immunity analysis on this claim may look different at summary judgment once the factual record has been developed. However, as pled, the Officers are not entitled to qualified immunity for their alleged unlawful entry into the home. The motion to dismiss Count 1 of the FAC is DENIED.

### a. The Doorway Exception

First, the Officers argue that the unlawful entry claim should be dismissed because the case law is clear that a suspect may not thwart an otherwise proper arrest by retreating into the home, even if the arresting officer must follow the individual into the home to affect the arrest. Mot. at 12-13 (citing *United States v. Santana*, 427 U.S. 38, 42 (1976) and *United States v. Botero*, 589 F.2d 430, 432 (9th Cir. 1978)). Malek argues that the new allegations in the FAC make clear that he never stood in the doorway to his home, and therefore he was never in a public place and the doorway exception does not apply. *See* Opp'n at 14 (citing FAC ¶¶ 51, 55, 57-58). In its Prior Order, the Court found that the Officers were entitled to qualified immunity under the second prong. *See* Prior Order at 18-25. The Court now finds that the FAC pleads around qualified immunity and this cause of action may proceed to discovery.

#### 1. Constitutional Violation

The Officers argue that the new allegations in the FAC should not change the Court's prior qualified immunity analysis because under *United States v. Santana*, 427 U.S. 38, 42 (1976), and *United States v. Botero*, 589 F.2d 430, 432 (9th Cir. 1978), a suspect may not thwart an otherwise proper arrest by retreating into the home, even if the arresting officer must follow the individual into the home to affect the arrest. *See* Mot. at 13. Because Malek has now pled that he was never in the doorway and was not arrested "at the door," the Court finds that the *Santana* and *Botero* line of authority is inapplicable to the constitutional analysis.

In *Santana*, the Supreme Court established that the open doorway of a private residence is a public place where an individual does not have any expectation of privacy. 427 U.S. at 42 (relying on prior precedent from *United States v. Watson*, 423 U.S. 411 (1976) holding that warrantless arrest of an individual in a public place does not violate the Fourth Amendment). In *Santana*, undercover officers investigating a drug conspiracy pulled up in front of the defendant's house, where she was "standing in the doorway of the house," with a brown paper bag in her hand. 427 U.S. at 40. One of the officers testified that Santana was "directly in the doorway," meaning that "one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." *Id.* at 40 n.1. "As the officers approached, Santana retreated into the vestibule of her house." *Id.* at 40. The officers followed her through the open door and arrested her inside of her home. *Id.*

In holding that the warrantless arrest in *Santana* was lawful, the Supreme Court reasoned that "[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." 427 U.S. at 42 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). Santana therefore had no expectation of privacy when she stood in the doorway because she "was exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." 427 U.S. at 42. The Supreme Court explained that Santana's retreat into her house could not thwart an otherwise proper arrest. *Id.* at 43 ("We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under *Watson*, by the expedient of escaping to a private place.") The Supreme Court also found that the warrantless entry into Santana's home was justified as a "hot pursuit," permitting them to cross the threshold to arrest her inside the vestibule. *Id.*

In contrast, Malek alleges that he *never* stood in a public place. FAC ¶ 51. Rather, he alleges that when the Officers knocked on his door, Malek "partially opened the front door while standing well within his home, some feet away from the front door's threshold." *Id.* The FAC never alleges that Malek moved into public view at the doorway or outside of his house, and ultimately alleges that Malek "closed the door slightly, stepped back further into his house, stated that he wanted to speak to his attorney, and he again demanded to see Defendants' search

warrant." *Id.* ¶ 55.  After Malek closed the door, Officer Sandri "barged into [Malek's] home, crossing the threshold, pushing open the front door, and forcing [Malek] to walk backwards further into his home so that [Officer Sandri] would not walk into him." *Id.* ¶ 57.  The other Officers followed Officer Sandri into the house, and Malek clearly conveyed his lack of consent to the entry by firmly asking something to the effect of: "what were they doing coming into his house?" *Id.*  Based on these allegations, the Court cannot infer that Malek was ever "exposed to public view, speech, hearing, and touch" as if he had been standing completely outside of his home. *Santana*, 427 U.S. at 42.  The Court draws the plausible inference from the FAC that while Malek conferred with the police, he stood at least an arm's length from the doorway, inside the vestibule of his private home.

Malek also alleges that at the time of his arrest—meaning when the Officers actually told him he was under arrest and handcuffed him behind his back—all of the Officers and Malek were standing in his living room.  FAC ¶ 58.  Therefore, it is clear for purposes of this motion to dismiss that the actual arrest occurred inside the vestibule of Malek's home and not in the doorway.  *See, e.g.*, *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980) ("[I]t is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home.").

These allegations bring this case outside the realm of *Santana*, as well as *Botero* and *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir. 1995), which involved suspects who were arrested at the doorway.  In *Vaneaton*, at the moment of arrest, the suspect "was standing at the doorway [to his motel room] but just inside the threshold." 49 F.3d at 1425.  The police did not enter Vaneaton's room until after they formally placed him under arrest.  *Id.* at 1427.  In *Botero*, the Ninth Circuit applied *Santana* to uphold the legality of a warrantless arrest of a defendant standing in the doorway of his home. 589 F.2d 430.  Botero, who was under surveillance, opened his door in response to a knock by police and was arrested while he stood "in the doorway." *Id.* at 431.  None of these cases speaks to the situation alleged in the FAC where Malek never exposed

himself to a public place and was placed under arrest in his living room.  FAC ¶¶ 55-58.[7]

The Court agrees with Malek that the "at the door" exception to the warrant requirement does not apply to arrests made beyond the doorway.  *See* Opp'n at 14 (citing *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 955 (9th Cir. 2000)).  In *LaLonde*, the Ninth Circuit interpreted *Santana* and *Vaneaton* to mean that "[t]he Fourth Amendment's prohibition on warrantless entry into an individual's home does not apply to arrests made at the doorway, because the doorway is considered a public place." 204 F.3d 947, 955 (9th Cir. 2000).  However, the arrest in *LaLonde,* like Malek's arrest alleged in the FAC, was not made at the doorway.  Rather, when LaLonde's roommate opened the door in response to the police, LaLonde came into view but "remained inside the apartment and did not at any time reach the doorway." *Id.* at 951.  LaLonde spoke to the police from inside the apartment about a disturbing the peace complaint that had been made by his neighbor. *Id.* at 955.  Ultimately, the officers "crossed the threshold of the door and entered LaLonde's apartment" to pepper spray and arrest him.  *Id.*  The Ninth Circuit held that "the present case does not fall under the doorway exception," and reversed the district court's finding of qualified immunity on LaLonde's claim for illegal entry. *Id.*

The Officers attempt to distinguish this case from *LaLonde* because it was Malek, and not his wife or roommate, who opened the door to the house in response to a noncoercive police knock.  *See* Reply at 8-9.  Unlike LaLonde, the Officers argue, Malek exposed himself to a warrantless arrest by opening the door at all, and his retreat "further" into the home could not thwart an otherwise proper arrest.  *Id*. at 9 (citing *Santana*, 427 U.S. at 42).  But as discussed above, the arrestees in *Santana*, *Vaneaton*, and *Botero* all stood in a public place when the Officers sought to arrest them.  The Court finds, drawing all reasonable inferences in favor of Malek at this stage, that Malek was never in the doorway and the arrest did not take place in the doorway.  Therefore, at this stage, the doorway exception does not justify the Officers' warrantless entry to arrest Malek in his living room.

---

[7] Moreover, the Court found that exigent circumstances existed in both *Santana* and *Botero*, whereas no exigent circumstances are alleged in this case, as discussed below.

## 2. *Clearly Established*

Regardless of the existence of a constitutional violation, Malek's unlawful entry claim only survives the Officers' assertion of qualified immunity if that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court acknowledges that it previously held that based on the original complaint, the unlawful entry was not clearly established at the time of the challenged conduct. *See* Prior Order at 19. This is because in defending his original complaint, Malek did not meet his burden to identify a case that would have alerted a reasonable officer under the circumstances that entering Malek's home was unlawful.

Based on the amended allegations in the FAC, the Court finds that Malek has now met his burden under the second prong of qualified immunity to "*identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment." *Sharp*, 871 F.3d at 911 (emphasis in original) (quoting *White v. Pauly*, 137 S.Ct. at 552). Malek argues that *LaLonde* clearly establishes that law enforcement officers cannot break the threshold of a home to detain or arrest an individual who is standing inside his home. 204 F.3d 947, 955 (9th Cir. 2000); *see* Opp'n at 15. The Court agrees that the Ninth Circuit was clear in *LaLonde* that the doorway exception does not extend to circumstances where the officers did not attempt to arrest the suspect at the doorway, but rather asked the suspect questions while the suspect stood "a few feet inside the apartment." 204 F.3d at 955. If the arrest takes place only after the officers have crossed the threshold of the door and entered the home, the Ninth Circuit clearly established that such a case "does not fall under the doorway exception." *Id.* Thus, *LaLonde* put the constitutional question confronting the Officers in Malek's case "beyond debate." *Sheehan*, 135 S.Ct. at 1774.

Malek also cites to *Quintero v. City of Escondido*, No. 15-CV-2638-BTM-BLM, 2017 WL 4005345, at *6–7 (S.D. Cal. Sept. 11, 2017). Opp'n at 15. *Quintero* itself cannot clearly establish the law in this case because it is from a district court and it post-dates the alleged incident. However, *Quintero* relies on controlling precedent from the Ninth Circuit in *United States v. Quaempts*, 411 F.3d 1046, 1048 (9th Cir. 2005), which the Court finds is adequately particularized to the facts of this case. *See White v. Pauly*, 137 S.Ct. at 552.

In *Quaempts*, the Ninth Circuit began by explaining: "Darrell Quaempts' trailer home was

22

so small that he could open the front door while lying in his bed. His doing so on one unfortunate occasion, in response to the knock of Yakima Nation police officers, resulted in his warrantless arrest for sexual assault." 411 F.3d at 1047. The Ninth Circuit affirmed the district court's grant of Quaempts' motion to suppress statements made immediately following the arrest, because the court held that the government required a warrant before arresting Quaempts at home. *Id.* The government argued in *Quaempts* that the suspect waived any expectation of privacy when he opened the door to the police. The Ninth Circuit clearly held that the doorway exception did not apply because "Quaempts was not standing in the doorway of his home, however, he was in his bed. By reaching over and opening the door he did not waive the expectation of privacy expressly guaranteed by the Fourth Amendment to all persons to be secure in their houses." *Id.*

Although Malek's home was not so small that he could open the front door from his bed, he does allege that he was a large-statured man, over 6 feet tall, who could plausibly remain "well within his home" when he partially opened the front door to police. FAC ¶¶ 51, 58. The question before the Ninth Circuit in *Quaempts* was whether the suspect waived any expectation of privacy in his house by knowingly opening the door to the police knock while he remained in bed. 411 F.3d at 1048. The Ninth Circuit answered that question with a resounding "no," and explained that extending the holding of *Vaneaton* "beyond the threshold into the interior of the home would do violence to the principles laid down in *Payton* that established a zone of privacy inside the physical dimensions of one's home." *Id.* (citing *Payton,* 445 U.S. at 589). As in *Quaempts*, the Court must infer from the FAC that Malek "did not take himself outside the physical zone of privacy of the house by going to the threshold of his house or to any other public place." 411 F.3d at 1048–49. Thus, as alleged, it was clearly established that the Officers could not break the threshold of Malek's home under the doorway exception to arrest him without a warrant or exigent circumstances. *LaLonde* and *Quaempts* involve similar factual circumstances to those alleged in the FAC sufficient to give the Officers fair warning that entering Malek's home was unconstitutional.

### b. Exigent Circumstances

Aside from the "doorway" exception, the Officers argue that exigent circumstances existed

to justify the warrantless entry into Malek's house. *See* Mot. at 13. The Court did not resolve the exigent circumstances issue in its Prior Order because the unlawful entry claim was dismissed with leave to amend under the doorway exception. Prior Order at 25-26. Now, without qualified immunity on the doorway exception or consent to enter, the Officers needed either a warrant or exigent circumstances to lawfully cross the threshold into the house. As pled in the FAC, they had neither. Thus, although the Court agrees that the Officers are entitled to qualified immunity with respect to whether the arrest was supported by probable cause, their warrantless entry into the vestibule of Malek's home to arrest him in the alleged circumstances was unconstitutional.

"The Fourth Amendment prohibits police officers from making a warrantless entry into a person's home, unless the officers have probable cause *and* are presented with exigent circumstances." *LaLonde*, 204 F.3d at 954 (citing *United States v. Prescott*, 581 F.2d 1343, 1350 (9th Cir. 1978) ("[A]bsent exigent circumstances, police who have probable cause to arrest a felony suspect must obtain a warrant before entering a dwelling to carry out the arrest.")). Exigent circumstances can include, in relevant part to this case, "(1) the need to prevent physical harm to the officers or other persons, [and] (2) the need to prevent the imminent destruction of relevant evidence." *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010).

The Officers argue that the FAC pleads exigent circumstances on its face. Mot. at 13-14. Specifically, once Malek confirmed the information in the PPR, refused to surrender his registered firearms, and closed the door (FAC ¶¶ 51-53), the Officers argue that they were entitled to make a split-second decision to enter the home to prevent Malek—a suspect with a prior misdemeanor conviction—from destroying or concealing evidence of gun ownership, or arming himself for violent resistance. Mot. at 14. The Officers' reliance on *Santana* and *United States v. Lindsey*, 877 F.2d 777, 781 (9th Cir. 1989) to demonstrate that exigent circumstances exist on the face of the FAC is unavailing. *Santana* was undeniably a "hot pursuit" case, and *Lindsey* involved the officers' reasonable belief that guns *and bombs* were inside a house in a densely populated residential neighborhood. 877 F.2d at 781.

Here, the FAC pleads only that Malek confirmed he had a misdemeanor conviction and several registered firearms. Under the facts alleged, it was clearly established that the warrantless

entry was not justified by exigent circumstances. *LaLonde*, 204 F.3d at 958 n. 16 ("The mere fact that a person owns a rifle and does not like law enforcement officials does not in itself allow police officers to enter the person's home and seize him simply because he is unwilling to step into the public domain for questioning, even if probable cause exists to believe that some offense has been committed.")

As stated on the record at the May 3, 2018 hearing, the FAC does not plead exigent circumstances and the Officers' argument that they are entitled to qualified immunity on the unlawful entry claim will have to wait for a developed factual record at summary judgment. The existence of exigency is purely conjectural at this point, and to find otherwise would support the sweeping and legally unsupported conclusion that exigency exists every time a suspect who owns a gun does not respond to questioning or allow police to enter his or her home.

For the foregoing reasons, the Officers' motion to dismiss Count 1 for unlawful entry is DENIED. Whether the doorway exception or exigent circumstances shields the Officers from liability for their warrantless entry may be revisited at summary judgment, when the Court has the benefit of deposition testimony and body camera footage. As it stands, Malek has pled that he maintained his position within the vestibule of his home at all times, at least an arm's length from the doorway, and that he was arrested in his living room. The Court also cannot infer any exigency justifying the intrusion. Malek has thus alleged that the Officers' entry into his home violated his Fourth Amendment rights, which were clearly established under the circumstances.

### iii. Unlawful Searches

Malek's third § 1983 cause of action for unlawful searches in violation of the Fourth Amendment includes separate allegations that the Officers conducted (1) an unlawful pre-warrant search of Malek's home; and (2) an unlawful search based on a facially invalid search warrant procured by judicial deception. *See* FAC ¶¶ 105-107.[8] The Officers move to dismiss both claims

---

[8] In response to the Officers' request for a more definite statement on Malek's previously dismissed claim for execution of an overbroad search warrant, Malek confirmed that he no longer pursues claims based on the search warrant's overbreadth. *See* Opp'n at 3.

for failure to state a claim and based on qualified immunity.  Mot. at 17-19.  The Court addresses each allegedly unconstitutional search in turn.

### a.    Pre-Warrant Search

Malek alleges that before obtaining a search warrant, Officers Green and Favela searched the house, located the gun safe and shotgun, and took photographs of Malek's vehicles in his garage.  FAC ¶¶ 60-61.  The Court finds that the § 1983 claim for an unlawful pre-warrant search is tied to the Officers' unlawful entry into Malek's home without a warrant or exigent circumstances.  The cases relied on by the Officers are inapplicable, as those cases involved protective sweeps where they officers were lawfully within the home.  *See, e.g.*, *Maryland v. Buie*, 494 U.S. 325, 327 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).  If the Officers could not constitutionally enter Malek's house, as discussed above, it follows that they are not shielded by qualified immunity for the protective sweep.

For the reasons discussed above regarding the unlawful entry, as well as those stated on the record at the May 3, 2018 hearing, the Officers' motion to dismiss Malek's third cause of action based on an unlawful pre-warrant search is DENIED.[9]

### b.    Judicial Deception

In contrast to the pre-warrant search, the Court finds that the judicial deception claim rises and falls with Malek's claim for an arrest without probable cause.  Malek alleges that the Officers, under the supervision of Officer Sandri, caused or permitted a false search warrant to be drafted and presented to a judge.  Opp'n at 19 (citing FAC, ¶¶ 67, 77-79, 88).  The false statement in support of probable cause was that Malek was prohibited from owning or possessing firearms under Penal Code § 29805 due to his § 417.4 conviction.  FAC ¶ 77.  There is no allegation that any of the Officers ever reviewed § 29805—indeed, Malek's theory is that the Officers did not check the statute even though they had an obligation to know the law that they were enforcing.

---

[9] With respect to Officer Sandri, the FAC alleges that he remained with Malek while Officers Green and Favela conducted the pre-warrant search.  FAC ¶ 60.  However, Malek also alleges that Officer Sandri "supervised" the entire operation.  *Id*. ¶ 7.  Thus, even if Sandri did not conduct the pre-warrant search, this claim may move forward based on Officer Sandri's supervisory liability.

Thus, the same qualified immunity analysis for the Officers' probable cause to arrest applies to the judicial deception claim.

As discussed at length above, the unlawful arrest claim fails under both prongs of qualified immunity because it was not objectively unreasonable for the Officers to rely on the PPR to support probable cause to arrest once they confirmed Malek's identity, conviction and that he owned firearms. The right allegedly violated was also not clearly established. The Officers are therefore also entitled to qualified immunity on the judicial deception claim for stating their reasonable basis for probable cause in the search warrant application. Accordingly, the Officers' motion to dismiss Count 3 based on a search pursuant to a warrant obtained by judicial deception is GRANTED WITHOUT LEAVE TO AMEND.

### iv.    Excessive Force

Count 4 of the FAC alleges that the Officers used excessive force in violation of Malek's Fourth Amendment rights. *See* FAC ¶¶ 108-110. Supreme Court precedent directs this Court to analyze claims of excessive force during an arrest under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Under *Graham*, "determining whether force used in making an arrest is excessive calls for a fact-intensive inquiry requiring attention to all circumstances pertinent to the need for the force used." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015); *see also Green v. City & Cnty. of S.F.,* 751 F.3d 1039, 1049 (9th Cir. 2014) (the "objective reasonableness" of officers' use of force "is determined by an assessment of the totality of the circumstances"). The Supreme Court has acknowledged that there is no "easy-to-apply legal test" for an excessive force claim. *Scott v. Harris*, 550 U.S. 372, 383 (2007). Rather, courts "must still slosh our way through the factbound morass of 'reasonableness.'" *Id*.

Pursuant to *Graham*, whether a particular seizure is reasonable must be "judged from the perspective of a reasonable officer on the scene," 490 U.S. at 396, and "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Courts are also free to

consider issues outside the three enumerated in *Graham* when additional facts are necessary to account for the totality of circumstances in a given case. *See Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).

This Court previously dismissed Malek's excessive force claim under the second prong of qualified immunity because it was not clearly established under the particularized allegations that the Officers' use of handcuffs for nine hours while they procured the search warrant amounted to a constitutional violation. *See* Prior Order at 26-32. Malek was granted leave to amend his allegations regarding the nature of his handcuffing and detention. *Id.* at 32. Malek now pleads that he was initially handcuffed behind his back with only a single set of handcuffs even though the Officers were trained to use two sets of handcuffs on large statured persons. FAC ¶ 58. At some point a few hours after Officer Green left to procure the search warrant, Malek alleges that he told Officers Sandri and Favela that he was experiencing pain from the handcuffs because he had a pre-existing injury and the handcuffs were too tight, but his complaints were ignored. *Id.* ¶ 71. Malek also asked Officer Sandri to handcuff him in the front but Officer Sandri refused, even though he had discretion to handcuff arrestees in front where the arrestee is cooperative and nonthreatening. *Id.* ¶¶ 72-73. Eventually Officer Sandri handcuffed Malek in the back using two sets of handcuffs. *Id.* ¶ 74. Officer Sandri also ignored Malek's request to take his prescribed medication for his back and shoulder pain. *Id.* ¶ 76.

Importantly, the Court dismissed all of Malek's claims in the original complaint, including the unlawful entry claim. Now, because the Court concludes that the Officers are not entitled to qualified immunity at this stage on the unlawful entry, the Court also finds that Malek has adequately pled an excessive force claim and that the constitutional violation alleged was clearly established in light of the unlawful entry. Malek has alleged that the Officers were not constitutionally permitted to cross the threshold into his home under the circumstances (*i.e.* without a warrant, consent, or exigency) and therefore it was unreasonable for the Officers to use any force to detain him in his living room. Opp'n at 19-20. Accordingly, the cases relied on by the Officers holding that handcuffing is routine practice during a lawful arrest or the execution of a lawful search warrant are not applicable where the Officers' very presence in Malek's home was

unconstitutional. *See Shaw v. City of Redondo Beach,* No. CV-05-0481-SVW-FMO, 2005 WL

6117549, at *7 (C.D. Cal. Aug. 23, 14 2005) (collecting cases); *Sinclair v. Akins*, 696 F. App'x

773, 776 (9th Cir. 2017); *Muehler v. Mena*, 544 U.S. 93, 98 (2005).[10]

Separate and apart from the issue of whether any use of force was justified if the unlawful

entry was unlawful, Malek also alleges that he complained to Officers Sandri and Favela that the

handcuffs were too tight and causing him unnecessary pain. FAC ¶ 71. Regarding the issue of

overly tight handcuffing, the Officers argue that they are shielded by qualified immunity because

there is no consensus among courts on whether a tight handcuffing claim without any alleged

injury is cognizable. *See* Reply at 11. But the Officers do not convince the Court that Malek must

allege at the pleading stage—as opposed to offering evidence at summary judgment—that he

suffered actual injury beyond expressing his discomfort and pain to the Officers.

The primary case relied on by the Officers, *Arpin v. Santa Clara Valley Transportation

Agency,* held that conclusory allegations of injury from handcuffing that are unsupported by

medical records or other factual data are insufficient to defeat a motion for summary judgment.

261 F.3d 912, 922 (9th Cir. 2001). But *Arpin* does not speak to what is required to plead a

constitutional violation at the motion to dismiss stage, and the facts in *Arpin* did not involve an

allegation that the plaintiff had complained about the tightness of the handcuffs. *Id.* Thus, *Arpin*

does not preclude Malek's claims that the Officers used excessive force by keeping Malek

handcuffed tightly behind his back for nine hours causing him unnecessary and prolonged pain

after ignoring his complaints that the handcuffs were too tight and aggravating his pre-existing

back injury. *See* FAC ¶¶ 71-76. The law is clearly established in these circumstances that "overly

tight handcuffing can constitute excessive force." *Wall v. Cnty. of Orange,* 364 F.3d 1107, 1112

(9th Cir. 2004); *Meredith v. Erath,* 342 F.3d 1057, 1063 (9th Cir. 2003) (holding that "to place and

keep [a person] in handcuffs that were so tight that they caused her unnecessary pain violated her

---

[10] The Court acknowledges that an excessive force claim cannot be predicated solely on the fact of an unlawful arrest. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1030 (9th Cir. 2015). However, it is the "need for force which is at the heart of the *Graham* factors," and thus, the force used to make an arrest must be balanced against the need for that force. *See Blankenhorn v. City of Orange,* 485 F.3d 463, 480 (9th Cir. 2007). Malek has alleged that there was no need for any force because there was no legal basis for the Officers to handcuff him at all in his living room.

Fourth Amendment right to be free from an unreasonable seizure"); *LaLonde*, 204 F.3d at 960 ("A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force.")

For the foregoing reasons, as well as those stated on the record at the May 3, 2018 hearing, the Officers' motion to dismiss Malek's excessive force claim is DENIED. At summary judgment, the Court may revisit whether *Arpin* requires Malek to point to specific evidence in the record to demonstrate that he sustained actual injuries. 261 F.3d at 922.

### v.    Retaliation

The sixth count in the FAC alleges that the Officers interfered with Malek's "right to be free from government retaliation for exercise of Constitutional rights (including Second Amendment rights to lawfully possess firearms and Fourth Amendment rights to be free from invasion and search of home without a warrant) and for protected speech in exercise of Constitutional rights, as secured by the First Amendment and Fourteenth Amendments of the U.S. Constitution." FAC ¶ 115(a). Malek's theory is that the Officers did not go to his home with the intent to arrest him, but became "visibly irritated" and decided to arrest and "spitefully" handcuff Malek only after he asserted his rights. *See* FAC ¶¶ 48-49, 54, 58; Opp'n at 22. Malek alleges that he was punished for his "defiance" in refusing to do things "the easy way" and giving up his firearms voluntarily. FAC ¶ 56.

To state a claim for retaliation under the First Amendment, Malek must allege facts to support that (1) the Officers' conduct "would chill or silence a person of ordinary firmness from future First Amendment activities," and (2) "the evidence must be sufficient to establish that the officers' desire to chill [Malek's] speech was a but-for cause of their conduct." *Ford v. City of Yakima*, 706 F.3d 1188, 1194 (9th Cir. 2014). The Court previously dismissed the retaliation claim for failure to allege a constitutional violation under the first prong of qualified immunity. *See* Prior Order at 35-37. The Officers argue that the new allegations do not save Malek's claim, and that they are entitled to qualified immunity under the second prong as well. *See* Mot. at 21.

For the reasons outlined in the Court's Prior Order, as well as those stated on the record at the May 3, 2018 hearing, Malek has not plausibly alleged that the Officers' conduct was motivated by a desire to retaliate against him for his assertion of his Second and Fourth Amendment rights.

30

Even if the Court assumes that the Officers originally intended to cite and release Malek without plans to arrest him—which is conclusory and not supported by any factual allegations—that is not sufficient to allege causation.  It is not plausible to infer that Malek would *not have been* arrested, handcuffed, had his home searched and taken to jail "but for" the Officers' retaliatory animus and desire to punish him for his speech.

Police encounters occur every day where officers start conversations with citizens, ask investigative questions, and make determinations as to a course of action.  Thus, it is not surprising that Malek fails to identify a case that even comes close to clearly establishing that police officers cannot discuss alternatives with suspects before making an arrest or detention.  *See* Opp'n at 23 (citing *Ford*, 706 F.3d at 1195 and *Morales v. Fry*, 873 F.3d 817, 826 (9th Cir. 2017)).  Neither *Ford* nor *Morales* is factually analogous to the case at hand, but rather stand for the general principle that it is unlawful for the police to retaliate against individuals for their protected speech.[11]  Even if Malek could make out a plausible retaliation claim, which he has not, the circumstances presented are certainly not an obvious case of constitutional misconduct and the law was not clearly established.

For the foregoing reasons, the FAC does not plausibly allege a retaliation claim against the Officers.  The Officers are further entitled to qualified immunity under the second prong because the state of the law did not give the officers fair warning that giving Malek alternatives and deciding to arrest him when he refused to give up his firearms voluntarily was unconstitutional.  *See Ford*, 706 F.3d at 1195.  Accordingly, the Officers' motion to dismiss the retaliation claim under § 1983 is GRANTED WITHOUT LEAVE TO AMEND.

### B.    State Law Causes of Action

### i.    Bane Act

Malek reasserts his claim against the Officers for a violation of the Bane Act, California Civil Code § 52.1.  FAC ¶¶ 117-122.  Because the Bane Act claim covers the same acts challenged under § 1983, the Officers argue that Count 7 should also be dismissed.  Mot. at 22.  As discussed

---

[11] Moreover, *Morales* post-dates Malek's arrest and cannot clearly establish the constitutional violation in this case.  873 F.3d 817.

31

above, however, Malek has pled viable § 1983 claims for unlawful entry (Count 1), unlawful pre-warrant search (Count 3), and excessive force (Count 4), and therefore his Bane Act claim based on the conduct underlying these claims cannot be dismissed on that basis.

The Officers argue that the Bane Act claim independently fails because Malek does not plead coercion independent from the alleged constitutional violations. Mot. at 22. The Court previously found this argument persuasive and dismissed the Bane Act claim in the original complaint with leave to amend in order for Malek to allege independent "threats, intimidation, or coercion." *See* Prior Order at 38-39 (citing *Doe v. State*, 8 Cal. App. 5th 832, 842–43 (Ct. App. 2017), *review denied* (June 14, 2017)). However, Malek now persuasively argues that allegations of an independent "threat, intimidation, or coercion" are not required to state a Bane Act claim.

The California Court of Appeal recently clarified in *Cornell v. City and County of San Francisco* that the Bane Act does not require "a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force." 17 Cal. App. 5th 766, 803 n.31 (Ct. App. 2017), *as modified* (Nov. 17, 2017), *review denied* (Feb. 28, 2018); *accord*, *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105–06 (9th Cir. 2014) ("[T]he elements of the excessive force claim under §52.1 are the same as under § 1983.") Rather, coercion can be proven by showing that a violation of rights was intentional. *Cornell*, 17 Cal. App. 5th at 801-802 ("[T]he egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure, not by whether the evidence shows something beyond the coercion 'inherent' in the wrongful detention.")

Absent definitive guidance from the California Supreme Court, who denied review in *Cornell*, the Officers urge the Court to reject *Cornell* and rely instead on "settled" law followed by the Ninth Circuit, requiring a plaintiff to allege independent coercive conduct. Reply at 15 (citing *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1196 (9th Cir. 2015); *Kenner v. United States*, 689 F. App'x 558, 560 (9th Cir. 2017) (unpublished); *Feiman v. City of Santa Monica*, 656 F. App'x 870, 871 (9th Cir. 2016) (unpublished)).

As discussed at the May 3, 2018 hearing, the ground underneath the Bane Act continues to

move and the Court finds that dismissal of the Bane Act claim at this stage would be premature and unsupported by recent developments in the law. Indeed, in the recent decision *Reese v. County of Sacramento*, the Ninth Circuit considered *Cornell* and determined that:

> [B]ased on the weight of this new state authority, and our obligation to consider the California Court of Appeal's thorough analysis of its own law, we draw two conclusions as to the necessary showing for an excessive force claim under the Bane Act. First, the Bane Act does not require the "threat, intimidation or coercion" element of the claim to be transactionally independent from the constitutional violation alleged. *Cornell*, 225 Cal. Rptr. 3d at 382–83. Second, the Bane Act requires a "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id*. at 384.

*See Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018); ECF 63-1 at 64. Importantly, the Ninth Circuit concluded in *Reese* that: "We see no 'convincing evidence that the state's supreme court likely would not follow' *Cornell* in reaching these two conclusions." *Id.*

Malek has plausibly alleged that the Officers intentionally violated his rights under § 1983—including by unlawfully entering his home without a warrant or exigency, conducting an unlawful pre-warrant search, and using excessive force. *See, e.g.*, FAC ¶¶ 93, 99, 121. In light of *Cornell* and *Reese*, the Court finds that Malek has made out a claim under the Bane Act. *See Cornell*, 17 Cal. App. 5th at 801-802. Accordingly, the Officers' motion to dismiss the Bane Act claim based on the conduct underlying the surviving § 1983 claims is DENIED.[12]

### ii.    State Law Immunities

Malek also brings state law claims against the Officers for negligence and personal injuries (Count 8); assault and battery (Count 9), and false arrest or imprisonment (Count 10). FAC ¶¶ 123-137. The Officers argue that state law immunities bar these claims. Mot. at 23-25. Malek concedes that the asserted state law immunities "track[] the fate" of his federal claims. Opp'n at 25. Based on the constitutional claims discussed above, the Court resolves the reasserted state law immunities as follows:

---

[12] As explained at length above, Malek has not plausibly alleged an unlawful arrest, an unlawful search based on judicial deception, or retaliation. Accordingly, this conduct cannot form the basis of Malek's Bane Act claim moving forward.

### a.   California Penal Code §§ 847(b), 835

The Officers argue that Malek's state law claims stemming from his arrest and the Officers' use of force trigger state law immunities that entitle the Officers to dismissal.  Mot. at 24.  The false-arrest immunity under Penal Code § 847(b)(1) protects officers from suit when they make an arrest that they had "reasonable cause" to believe was lawful.  Because the FAC pleads on its face that the Officers had probable cause to arrest Malek, § 847(b) also bars the parallel state law claims based on the arrest because the Officers necessarily had "reasonable cause" to believe the arrest was lawful.[13] *See Cornell*, 17 Cal. App. 5th at 786 ("California courts speak of reasonable cause and probable cause interchangeably…and appellants cite no case recognizing any meaningful distinction in the two phrases.") (internal citations and quotations omitted).  For these reasons, the Officers' motion to dismiss Malek's state law claims premised on an unlawful arrest is GRANTED WITHOUT LEAVE TO AMEND.

With respect to Penal Code § 835, which provides that an arrestee "may be subjected to such restraint as is reasonable for his arrest and detention," this immunity is inapplicable where Malek has adequately alleged a claim of excessive force.  Thus, Malek's claims for negligence, assault and battery, and false imprisonment, to the extent they arise from his allegations that the Officers used excessive force, are not barred by § 835.  *See Robinson v. Solano Cty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) ("California denies immunity to police officers who use excessive force in arresting a suspect.") (*citing Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 215 (1991).  Accordingly, the Officers' motion to dismiss Malek's state law claims at the pleading stage pursuant to  § 835 is DENIED.

### b.   California Government Code § 820.4

California Government Code § 820.4 provides that "[a] public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  Gov't Code § 820.4.  The parties agree that with the exception of the false arrest or imprisonment

---

[13] In addition to providing a basis for dismissal of Count Ten to the extent it alleges a false arrest, § 847(b) also bars Malek's Bane Act and negligence claims premised on an unlawful arrest.

claim, this immunity is coextensive with the first prong of qualified immunity on Malek's federal claims because the reasonableness inquiry also resolves the question of whether the Officers acted with "due care" under § 820.4. *See* Mot. at 24; Opp'n at 25. As discussed above, Malek has failed to allege constitutional violations with respect to Count 2 (unlawful arrest); Count 3 (judicial deception) and Count 6 (retaliation). Accordingly, Malek's parallel Bane Act, assault and battery, and negligence claims based on reasonable conduct by the Officers are DISMISSED WITHOUT LEAVE TO AMEND.

### C. Remaining Issues

The Officers raise three additional issues with the FAC, requesting that the Court (1) dismiss the Doe Defendants from the FAC because there are no facts implicating John Does; (2) strike Malek's references to joint and several liability from the FAC pursuant to Rule 12(f); and (3) strike paragraph 9 of the FAC regarding discovery. Mot. at 24-25. Although the use of Doe Defendants is disfavored in federal court, it is premature to dismiss Doe Defendants from the FAC prior to any discovery occurring in this case in light of the stipulated discovery stay in place. *See* ECF 58. Accordingly, the Officers' motion to dismiss the Doe Defendants is DENIED.

Turning to the motion to strike references to joint and several liability in the FAC, the Officers correctly note that this Court previously dismissed *without leave to amend* Malek's state law claims to the extent that he sought to hold the Officers vicariously liable for the actions of the others. *See* Prior Order at 40. However, Malek again reassures the Court that the FAC does not seek vicarious liability but rather reference "joint and several liability" so that he can recover for the total amount of damages against any concurrently culpable defendant. Opp'n at 25. Thus, the Officers' motion to strike Malek's prayers for joint and several relief is DENIED.

However, the Court agrees that the allegations in paragraph 9 of the FAC regarding the alleged refusal by the California Department of Justice to provide certain pre-suit discovery requests are immaterial and impertinent under Rule 12(f). Accordingly, the Officers' motion to strike paragraph 9 of the FAC is GRANTED.

**IV.    LEAVE TO AMEND**

Having determined that Malek's § 1983 claims for unlawful arrest, unlawful search based on a warrant procured by judicial deception, and retaliation—as well as the associated state law claims discussed above—are subject to dismissal, the Court must decide whether leave to amend is warranted.  The Court does not deny leave to amend lightly.  Leave ordinarily must be granted unless one or more of the following factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, and (5) futility of amendment.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

The Court finds no undue delay or bad faith.  However, despite the Court's Prior Order dismissing the original complaint with extensive guidance regarding amendment and qualified immunity, Malek still has not alleged plausible claims under § 1983 for unlawful arrest, unlawful search based on a warrant procured by judicial deception, retaliation, and associated state law claims based on such conduct.  Moreover, as to the § 1983 claims, the Officers are entitled to qualified immunity under the second prong because Malek has again failed to identify a case indicating that the right allegedly violated was clearly established.  *See Sharp*, 871 F.3d at 911.

After two motions to dismiss, two lengthy hearings and two thoroughly reasoned orders covering the same claims, the Court finds that Malek has failed to cure the previously identified deficiencies by amendment and further leave to amend the dismissed claims would be futile.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (finding that a plaintiff's failure to correct identified deficiencies in an amended pleading "is a strong indication that the plaintiffs have no additional facts to plead."); *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A district court's discretion to deny leave to amend is particularly broad where the plaintiff has previously amended.").  Moreover, the Court finds that the Officers would be prejudiced by further amendment as they have already twice defended and prevailed under both prongs of the qualified immunity analysis with respect to the conduct underlying the dismissed claims.

Weighing the *Foman* factors, the Court finds it appropriate to dismiss the § 1983 claims

United States District Court
Northern District of California

for unlawful arrest, judicial deception, and retaliation, as well as the state law claims based on such conduct, WITHOUT LEAVE TO AMEND.

## V.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Officers' motion to dismiss is DENIED with respect to Malek's § 1983 claims for unlawful entry into Malek's home (Count 1), unlawful pre-warrant search (Count 3), and excessive force (Count 4);

2. The Officers' motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND with respect to Malek's § 1983 claims for unlawful arrest (Count 2), search pursuant to a warrant procured by judicial deception (Count 3), violation of the Second Amendment (Count 5), and retaliation (Count 6),

3. The Officers' motion to dismiss the Bane Act claim is DENIED as to the conduct underlying the surviving § 1983 claims;

4. The Officers' motion to dismiss the state law claims in Counts 8, 9, and 10 pursuant to state law immunities is GRANTED IN PART WITHOUT LEAVE TO AMEND and DENIED IN PART in accordance with the Court's dismissal of the parallel § 1983 claims;

5. The Officers' motion to dismiss the Doe Defendants is DENIED; the motion to strike references to joint and several liability is DENIED; and the motion to strike paragraph 9 of the FAC is GRANTED.

6. The Officers SHALL ANSWER the FAC within 21 days of this Order. Nothing in this Order shall preclude the Officers from raising the defense of qualified immunity in a future motion or at trial, if appropriate.

7. As previously ordered, the stipulated discovery stay in this case automatically lifts 30 days after the date of this Order. *See* ECF 58 ¶ 8.

Dated: May 30, 2018

_Beth Labson Freeman_
BETH LABSON FREEMAN
United States District Judge

37